

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable Walter T. McKay, Chief
Div. Hortic. Insp. & Quarantines
Texas Department of Agriculture
Austin, Texas

Dear Sir:

Opinion No. O-6495
Re: Labelling of fungicides
containing "indefinite"
copper compounds under
Article 135b-1, Sec. 5,
V. A. C. S.

     Section 5, Chapter 98, Acts of 1943, Regular Session of the 48th Legislature, (Art. 135b-1, Sec. 5, V.A.C.S.) in setting forth the requirements for labels on insecticides and fungicides, provides in part that they shall include "the names and percentage amounts of each inert ingredient; or in place of the names and percentage amounts of each and every ingredient, the names and percentage amounts of each and every ingredient having insecticidal or fungicidal properties, and the total percentage of inert ingredients." (Emphasis ours)

     The Federal law dealing with the same subject reads as follows: "Provided, however, that in lieu of naming and stating the percentage amount of each and every inert ingredient the producer may at his discretion state plainly upon every ingredient of the insecticide or fungicide having insecticidal or fungicidal properties, and make no mention of the inert ingredients, except in so far as to state the total percentage of inert ingredients present." Title 7, Sec. 131, U.S.C.A.; Apr. 26, 1910, C. 191, Sec. 8, 36 Stat. 333. (Emphasis ours)

     A manufacturer shipping fungicides into Texas must comply with both the State and Federal provisions and though the language of the statutes is almost identical, a difference in opinion has arisen between the two jurisdictions as to the application of the above quoted statutes to the labeling of products containing certain "indefinite" compounds of copper. You submit with your request certain information and correspondence which fully develops the controversy and it is there disclosed that this variance in opinion has resulted in some manufacturers, who desire to comply with both State and Federal provisions, being placed in the awkward

NICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ...

Hon. Walter T. McKay, page 2

position of having their product barred from Texas unless they comply with the Texas interpretation and being prosecuted for misbranding under the Federal statute if they do.

That different and conflicting interpretations of practically identical statutory provisions affecting commerce between the states leads to disastrous results cannot be disputed. This is attested by the many agencies at work which seek to iron out the trade barriers among States of the Union. It must be concluded that the Texas Legislature had in mind the importance of uniformity when it borrowed heavily from the Federal Act of 1910 in passing the Texas Act of 1943 which regulates these matters. Furthermore, it is a well recognized rule of statutory construction that where one jurisdiction adopts a statute from another it is also presumed to have adopted the existing judicial construction unless such construction is against reason or the weight of authority. An established administrative construction is of less weight but it is at least persuasive that the legislature intended to adopt the construction along with the statute. Sutherland, Statutory Construction, (3rd. Ed.), Vol. 2, Sec. 5209, p. 551, Sec. 5106, p. 518.

It appears that since 1912 Federal authorities have, in the instance of the so-called "indefinite" copper compounds, permitted the use of such labels as the following:

COPPER B COMPOUND

COPPER AS METALLIC _____%

INERT INGREDIENTS _____%

This practice originated with "Insecticide Decision No. 6" of the United States Department of Agriculture, issued February 12, 1912 involving Bordeaux Mixture, one of the "indefinite" compounds, and it was there stated,

"Some uncertainty appears to exist in the minds of manufacturers and shippers of Bordeaux mixture paste and dry Bordeaux mixture concerning the method which should be employed in stating the inert ingredients, or both the active and inert ingredients in these products as required by the law. The department, therefore, considers it desirable to state its position on this subject for the information of the trade.

Hon. Walter T. McKay, page 3

"It is a well-established fact that the fungicidal properties of Bordeaux mixture are dependent upon the copper present in this mixture. The other substances, such as lime and water, are necessary but not active ingredients, and these, with magnesia and various other inorganic compounds which may be present, are inert, since they do not of themselves possess fungicidal properties. It seems clear, therefore, that within the meaning of the insecticide act of 1910 the metal, copper, is the active ingredient and the other substances present are to be regarded as inert."

Following this ruling, a label showing the percentage of copper expressed as metallic, together with a statement of other ingredients as inert, has been generally acceptable to U. S. authoritues, those of other states, and apparently to Texas until September 1944. However, our State Chemist has re-examined the correctness of this method of labelling these compounds and has concluded that a label in the following form should be required:

COPPER B COMPOUND

INGREDIENTS

BASIC COPPER SUPLHATE          ____%

INERT INGREDIENTS          ____%

ANALYSIS

COPPER AS METALLIC          ____%

It is our chemist's contention that the above label is required by the statutes, because, (1) "Insecticide Decision No. 6" erroneously declares that metallic copper is the active ingredient in this type of fungicide; (2) that the so-called "indefinite" copper compounds are not so indefinite as formerly supposed and that the name of the copper bearing compound, together with the percentage thereof contained in the mixture may be specified with enough certainty to be of practical use to purchasers and researchers; (3) that since metallic copper is admittedly not present as such in these products and the fungicidal properties exist in a compound of copper rather than in metallic copper, the present Federally approved label is actually misleading and erroneous, both as to the active and inert ingredients and the percentages thereof.

Hon. Walter T. McKay, page 4


Federal agencies and certain manufacturers defend the label now in use because of, (1) uniformity and long well recognized usage; (2) the view that the percentage of metallic copper which these fungicides will yield is the only stable and definite factor which may be specific about them and that this furnishes the most reliable information to the purchaser; (3) that to attempt to specify a definite percentage of an "indefinite" compound would actually mislead and subject the manufacturer to liabilities for misbranding.

We think the above statement of viewpoints raises questions of chemical fact rather than questions of law and we are neither qualified nor is it our function to pass upon such questions. However, the advocates of both types of labels seem to be in substantial agreement upon these points: (1) That the purpose of the law is to prevent fraud on the purchaser and that the maximum of reliable label information which may be required thereunder will best serve this purpose; (2) that in any event the percentage amount of metallic copper the product will yield should be set forth as the most reliable indicia of the quality of the product; (3) that it is desirable to specify the compound in which copper is present, where possible, though an "indefinite" compound is involved because such information would be useful to the purchaser and especially to researchers, and (4) that the so-called "indefinite" compounds of copper are to some extent indefinite in structure and that any stipulation of the percentage of such compound contained in a mixture is likely to contain some error.

In the light of the arguments pro and con on this matter you have propounded the following questions to us:

"1. Does the statement of the percentage of copper as metallic, or a similar statement meet the requirements of the Texas law for the names and percentage amounts of each and every ingredient having insecticidal and fungicidal properties?

"2. Does the statement of the name of the compound having fungicidal properties and the percentage of copper it furnishes, meet the requirements of the Texas law for the names and percentage amounts of each and every ingredient having fungicidal and insecticidal properties? Such a label would be, for example:-

Hon. Walter T. McKay, page 5

"INGREDIENTS

"Copper expressed as metallic in basic copper sulphate                                                          27%

"Inert ingredients                                                          73%

                                        Total                          100%

"Does the Texas Fungicide law require a statement of both the name and the percentage of the compounds having fungicidal properties, and does it permit an additional statement of the percentage of copper? Such label would be:-

"INGREDIENTS

"Basic Copper sulphate                          50%
"Inert ingredients                          50%

"ANALYSIS

"Copper expressed as metallic          27%

"Note the difference in the percentage of inert ingredients as given in No. 2 and No. 3.

"4.     Would a fungicide be misbranded if it carried a label as given in No. 3?"

We reiterate that the questions put to us depend primarily on a determination of chemical fact upon which we do not undertake to pass. However, on the basis of the information upon which the parties are in agreement it seems clear to us that all three of the labels suggested in your questions would be inaccurate to some degree because of the physical uncertainty of the compounds dealt with. Although the governing statute makes no exception in favor of these "indefinite" compounds, we do know that a statute cannot make certain that which is by nature uncertain. "The law requires nothing impossible." Broom, Max. 242. Taking this into account, we do not attempt to answer your questions categorically but we are of the opinion that any one of the three labels submitted would meet the requirements of the Texas law

Hon. Walter T. McKay, page 6

if such an interpretation be adopted by the Texas Department of Agriculture for the reason that each type of label seems to have substantial support by some respectable chemical authority. Both State and Federal agencies seem to be in agreement that the label set forth in question No. 2 would be more desirable than that now in use, but of course, the weight to be given considerations of uniformity are strictly matters of policy for determination by your department.

In closing, we would like to add this additional comment: that we do not wish to be understood as holding that a decision or administrative ruling involving the finding of a scientific fact forecloses another or later interpretation based on later scientific discovery or advancement. Furthermore, we should like to point out that no manufacturer would be justified in non-compliance with a statute regulating the labeling of his product merely because compliance might disclose a trade secret. See United States v. Thirty Dozen Packages of Roach Food, 202 Fed. 271.

We are returning herewith the exhibits attached to your request and we hope our views will be of some benefit to you.

Very truly yours

ATTORNEY GENERAL OF TEXAS

BY *Eugene Alvis*

Eugene Alvis
Assistant

EA:zd
Encl.

APPROVED APR 30 1945